## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

DANIELLE KEVEANOS,

Plaintiff,

v.

NANCY A. BERRYHILL, Acting
Commissioner of Social Security,

Defendant.

Civ. No. 18-3421

OPINION

### KEVIN MCNULTY, U.S.D.J.:

Plaintiff Danielle Keveanos brings this action pursuant to 42 U.S.C. § 405(g) to review a final decision of the Commissioner of Social Security ("Commissioner") denying her claims to Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-34.

Keveanos raises two principal issues in this appeal.

First, Keveanos contends that the ALJ failed to properly consider the medical evidence. In particular, she argues, the ALJ omitted certain medical testing and treatment notes from his decision, and improperly weighed the opinions of her treating physician and the state agency doctor.

Second, Keveanos argues that the ALJ incorrectly accessed her residual functional capacity ("RFC"). In particular, she argues, the ALJ erroneously discounted her subjective complaints of pain and her treating physician's determination that could sit for less than six hours.

For the following reasons, the decision of the ALJ is affirmed.

## I.    Background[1]

Keveanos seeks to reverse the ALJ's finding that she did not meet the Social Security Act's definition of "disabled" from May 7, 2013, the alleged onset date, through January 25, 2017, the date of the ALJ's decision. (R. 25-32).

On June 20, 2014, Keveanos applied for DIB under Title II, alleging that she was disabled as of May 7, 2013, as a result of chronic back pain; degenerative disc, joint, and facet disease; torn discs; and hypothyroidism. (R. 55-56, 133). Her application was initially denied on September 18, 2014 (R. 63), and upon reconsideration on November 3, 2014. (R. 64).

On November 28, 2016, Keveanos appeared before the ALJ with an attorney and testified. (R. 25). Mary D. Anderson, a vocation expert ("VE"), also testified. (*Id.*).

On January 25, 2017, the ALJ issued a decision finding that Keveanos was not disabled within the meaning of the Social Security Act. (R. 25-32). The ALJ concluded that Keveanos's lumbar degenerative disc disease and associated musculoskeletal disorders were severe, but not of listing-level severity. (R. 27-29). Finally, the ALJ concluded that Keveanos, given her RFC, was able to perform work existing in the national economy. (R. 31-32).

## II.    Standard

To qualify for DIB under Title II of the Act, a claimant must demonstrate that there is some "medically determinable basis for an impairment that prevents him or her from engaging in any substantial gainful activity for a

---

[1]    Citations to the record are abbreviated as follows:

"DE"   =      Docket entry in this case;

"R. _" =      Administrative Record (DE 10) (The cited page numbers correspond to the number found in the bottom right corner of the page for all DE 10 attachments);

"PBr." =      Plaintiff Keveanos's brief (DE 18);

"SSABr." =    Social Security Administration Secretary's opposition brief (DE 23);

"Reply" =     Plaintiff Keveanos's reply brief (DE 26).

statutory twelve-month period." *Kangas v. Bowen*, 823 F.2d 775, 777 (3d Cir. 1987); 42 U.S.C. § 423 (d)(1) (1982). Additionally, the claimant must show that she had disability insured status at the time she became disabled or that she attained this status at some point during her disability. 42 U.S.C. §§ 416(i)(1), 423; 20 C.F.R. § 404.131.

## A. The Five-Step Process and This Court's Standard of Review

Under the authority of the Social Security Act, the Social Security Administration has established a five-step evaluation process for determining whether a claimant is entitled to benefits. 20 C.F.R. §§ 404.1520, 416.920. This Court's review necessarily incorporates a determination of whether the ALJ properly followed the five-step process prescribed by regulation. The steps may be briefly summarized as follows:

**Step One:** Determine whether the claimant has engaged in substantial gainful activity since the onset date of the alleged disability. 20 C.F.R. §§ 404.1520(b), 416.920(b). If not, move to step two.

**Step Two:** Determine if the claimant's alleged impairment, or combination of impairments, is "severe." *Id.* §§ 404.1520(c), 416.920(c). If the claimant has a severe impairment, move to step three.

**Step Three:** Determine whether the impairment meets or equals the criteria of any impairment found in the Listing of Impairments. 20 C.F.R. Pt. 404, subpt. P, app. 1, Pt. A. (Those Part A criteria are purposely set at a high level to identify clear cases of disability without further analysis). If so, the claimant is automatically eligible to receive benefits; if not, move to step four. *Id.* §§ 404.1520(d), 416.920(d).

**Step Four:** Determine whether, despite any severe impairment, the claimant retains the RFC to perform past relevant work. *Id.* §§ 404.1520(e)–(f), 416.920(e)–(f). If not, move to step five.

**Step Five:** At this point, the burden shifts to the Commissioner to demonstrate that the claimant, considering her age, education, work experience, and RFC, is capable of performing jobs that exist in significant

numbers in the national economy. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see Poulos v. Comm'r of Soc. Sec.*, 474 F.3d 88, 91-92 (3d Cir. 2007). If so, benefits will be denied; if not, they will be awarded.

As to all legal issues, this Court conducts a plenary review. *See Schaudeck v. Comm'r of Soc. Sec.*, 181 F.3d 429, 431 (3d Cir. 1999). As to factual findings, this Court adheres to the ALJ's findings, as long as they are supported by substantial evidence. *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004) (citing 42 U.S.C. § 405(g)). Where facts are disputed, this Court will "determine whether the administrative record contains substantial evidence supporting the findings." *Sykes v. Apfel*, 228 F.3d 259, 262 (3d Cir. 2000). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Zirnsak v. Colvin*, 777 F.3d 607, 610 (3d Cir. 2014) (internal quotation marks and citation omitted). Substantial evidence "is more than a mere scintilla but may be somewhat less than a preponderance of the evidence." *Id.* (internal quotation marks and citation omitted).

When there is substantial evidence to support the ALJ's factual findings, this Court must abide by them. *See Jones*, 364 F.3d at 503 (citing 42 U.S.C. § 405(g)); *Zirnsak*, 777 F.3d at 610-11 ("[W]e are mindful that we must not substitute our own judgment for that of the fact finder.").

This Court may, under 42 U.S.C. § 405(g), affirm, modify, or reverse the Commissioner's decision, or it may remand the matter to the Commissioner for a rehearing. *Bordes v. Comm'r of Soc. Sec.*, 235 F. App'x 853, 865-66 (3d Cir. 2007); *Podedworny v. Harris*, 745 F.2d 210, 221 (3d Cir. 1984).

Remand is proper if the record is incomplete, or if there is a lack of substantial evidence to support a definitive finding on one or more steps of the five-step inquiry. *See Podedworny*, 745 F.2d at 221-22. Remand is also proper if the ALJ's decision lacks adequate reasoning or support for its conclusions, or if it contains illogical or contradictory findings. *See Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 119-20 (3d Cir. 2000).

## B. The ALJ's Decision

The ALJ followed the five-step sequential process in determining that Keveanos did not meet the Social Security Act's definition of disabled from May 7, 2013, the alleged onset date, through January 25, 2017, the date of the ALJ's decision. (R. 25-32). The ALJ's findings may be summarized as follows:

**Step 1:** At step one, the ALJ determined that Keveanos had not engaged in substantial gainful activity in the relevant period. (R. 27).

**Step 2:** At step two, the ALJ determined that Keveanos had the following severe impairments: degenerative disc disease, including mild narrowing at L4-L5 and L5-S1; shallow lumbar levoscoliosis and mild loss of disc space at L2-L3; broad disc bulging at L3-L4 and L4-L5 and central dorsal annular abutment of the thecal sac; mild degenerative disc disease in the lower thoracic spine and lumbar spine at L2-L4 with small osteophytes; post-status T9 laminectomy; and lumbar facet arthropathy. The ALJ further determined that Keveanos's hypothyroidism was being treated successfully, and thus, was not severe. (R. 27).

**Step 3:** At step three, the ALJ determined that Keveanos did not have an impairment, or combination of impairments, that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Pt. 404, subpt. P., app. 1. (R. 27, 29 (citing Listing 1.04)).[2] Listing 1.04 provides:

> 1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> > A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle

---

[2]     The pages of the ALJ's decision were submitted to this Court out of order. The proper order can be reconstructed from the ALJ's page citations in the top right corner of each page. (See R. 25-32).

weakness or muscle weakness) accompanied by sensory or
reflex loss and, if there is involvement of the lower back,
positive straight-leg raising test (sitting and supine);

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.04.[3] In addressing this listing, the ALJ
noted that Keveanos lacked the attendant sensory and reflex loss. (R. 27, 29).

**Step 4:** At step four, the ALJ concluded that Keveanos had the residual
functional capacity ("RFC") to perform sedentary work, with the following
limitations and provisos:

[Keveanos can] occasionally push, pull, lift or carry 10 pounds,
and frequently push, pull, lift or carry less than 10 pounds; can sit
for six hours but must alternate to standing for 10 minutes after
every 20 minutes of sitting; can stand for two hours but must
alternate to sitting for 20 minutes after every 10 minutes of
standing; can walk for up to two hours; can occasionally climb
ramps, stairs, ladders, ropes or scaffolds; can frequently balance,
crawl and kneel; can occasionally stoop and crouch; and can have
occasional exposure to vibration, unprotected heights, moving
mechanical parts and humidity and wetness.

(R. 29). The ALJ also determined that Keveanos was unable to perform her past
work, including the jobs of nurse and administrative assistant. (R. 30).

---

3      Subparts (B) and (C) of § 1.04 provide:

B. Spinal arachnoiditis, confirmed by an operative note or pathology
report of tissue biopsy, or by appropriate medically acceptable imaging,
manifested by severe burning or painful dysesthesia, resulting in the
need for changes in position or posture more than once every 2 hours;

C. Lumbar spinal stenosis resulting in pseudoclaudication, established
by findings on appropriate medically acceptable imaging, manifested by
chronic nonradicular pain and weakness, and resulting in inability to
ambulate effectively, as defined in 1.00B2b.

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.04. Keveanos does not argue that she has been
diagnosed with spinal arachnoiditis, or that she is unable to ambulate.

**Step 5:** At step five, the ALJ considered Keveano's age on the alleged disability onset date (40), education (at least a high school education),[4] and work experience in conjunction with the Medical-Vocational Guidelines. (R. 31). Relying on the testimony of the VE, the ALJ identified several representative jobs Keveanos could perform despite her limitations: (1) document preparer (Director of Occupational Titles ("DOT") #249.587-018); (2) address clerk (DOT #209.587-010); and (3) election clerk (DOT # 205.367-030). (R. 31). The ALJ also determined, based on the VE's testimony, that a significant number of these jobs were available nationally. (R. 31-32).

Accordingly, the ALJ determined that Keveanos was not under a disability, as defined in the Social Security Act, from May 7, 2013 through January 25, 2017. (R. 32).

## II. Discussion

### A. The ALJ's Consideration of Medical Evidence

Keveanos raises multiple arguments that the ALJ improperly weighed the various medical opinions in the record. (PBr. at 17-35). First, Keveanos contends that the ALJ "misstated" the medical evidence in evaluating the medical opinions. (PBr. at 17). Next, Keveanos argues that the ALJ failed to consider the treatment notes in the record. (PBr. at 20). Finally, Keveanos asserts that the ALJ gave too little weight to the opinions of the treating physicians, and undue weight to the state agency doctor. (PBr. at 23-35).

Under 20 C.F.R. § 416.927(c), ALJs are required to weigh and evaluate "every medical opinion." Medical opinions are defined as "statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 416.927(a)(2). Accordingly, any diagnoses, prognoses, and statements about the severity and nature of impairments constitute medical opinions.

---

4     The record reflects that Keveanos has a nursing degree. (R. 41).

"[A] reviewing court should not re-weigh the medical opinions of record but should consider only whether the ALJ's weighing of such opinions was supported by substantial evidence." *Hatton v. Comm'r of Soc. Sec. Admin.*, 131 F. App'x 877, 880 (3d Cir. 2005) (citing *Monsour Med. Ctr. v. Heckler*, 806 F.3d 1185, 1190 (3d Cir. 1986)). "The ALJ—not treating or examining physicians or State agency consultants—must make the ultimate disability and RFC determinations." *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011) (citing 20 C.F.R. §§ 404.1527(e)(1), 404.1546(c)).

### 1. Evaluation of Medical Evidence

Keveanos points to two pieces of medical evidence that allegedly undermine the ALJ's conclusions. (PBr. at 18-20).

### a. *"Post-status laminectomy" vs. "post-laminectomy syndrome"*

As noted above, the ALJ determined that Keveanos suffered from "post-status T9 laminectomy" at Step 2. (R. 27). Keveanos contends that the record does not contain "a single reference by a medical provider" to this phrase. (PBr. at 18). Instead, Keveanos contends that the record supports a finding that she suffers from "post-laminectomy syndrome," or "failed back syndrome."[5] (PBr. at

---

[5]     In addressing the importance of the distinction between "post-status T9 laminectomy" and "post-laminectomy syndrome" or "failed-back syndrome," Keveanos relies principally on internet sources and evidence outside of the record. (*See* PBr. at 11 n.9; 18; Reply at 2). Keveanos did not present this material to the ALJ, has not sought to supplement the record, and does not point to medical evidence in the record to support this definition of post-laminectomy syndrome. (*See id.*). This Court may not consider any evidence that was not part of the record before the ALJ. *See Dunson v. Comm'r Soc. Sec.*, 615 F. App'x 65, 67 (3d Cir. 2015). When a claimant seeks to rely on evidence that was not before the ALJ, a district court has the option to remand the case to the Commissioner for consideration of that evidence, but only if the evidence is "new" and "material," and only if the claimant shows good cause why it was not presented to the ALJ. *Id.*

At any rate, the distinction at the Step 2 listing-equivalence stage would make little difference to this court's review. Keveanos principally argues that a finding of post-laminectomy syndrome would have required the ALJ to find that she suffers from severe back pain that worsened after the laminectomy. (Reply at 2-3). The ALJ thoroughly considered Keveanos's allegations of severe back pain, however, during the Step 3 analysis, rendering any failure to consider this condition at Step 2 harmless. *See* pp. 9–10, *infra*.

18; Reply at 1-3). The distinction is critical, according to Keveanos, because "post-laminectomy syndrome" suggests that she had a laminectomy in the past "that had a disastrous effect" resulting in "severe pain." (Reply at 2-3). On the other hand, "post-status T9 laminectomy" would suggest an "improvement" after surgery. (Reply at 2-3).

The record reveals that in August of 2013, Keveanos had a surgical implantation of a spinal cord neuro-stimulator, which reduced her back pain. (R. 268). Thereafter, Dr. Antonios Mammis provided several post-operative notes, which indicated Keveanos "is status post revision of her spinal cord stimulator system, which was performed on 06/16/2014 via T9 laminectomy." (R. 464; R. 471). Given the language of these notes, the record supports the ALJ's determination that Keveanos had a laminectomy "in the past."

Moreover, to the extent that the ALJ failed to find post-laminectomy syndrome as a "severe" impairment, any error at Step 2 is harmless. Where an ALJ finds in a claimant's favor with respect to at least one impairment, the disability analysis continues to Step 3. *See Salles v. Comm'r of Soc. Sec.*, 229 F. App'x 140, 149 n.2 (3d Cir. 2007). Where the disability analysis continues to Step 3, the ALJ must continue to consider the effects of all medically determinable impairments, regardless of severity. *Kerdman v. Colvin*, No. 13-04216, 2014 WL 3783872, at *8 (D.N.J. July 30, 2014). Thus, an ALJ's erroneous determination at Step 2 may constitute harmless error, provided that the impairment continues to be factored in. *See Salles*, 229 F. App'x at 145 n.2 ("Because the ALJ found in Salles's favor at Step Two, even if he had erroneously concluded that some of her other impairments were non-severe, any error was harmless.") (citing *Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005)).

The ALJ, it must be remembered, ruled in Keveanos's favor at Step 2, finding that she had a severe impairment. Keveanos's contention is that the ALJ's failure to find specifically that Keveanos suffered from post-laminectomy syndrome resulted in the ALJ's disregarding Keveanos's severe back pain. At

Step 3, however, the ALJ repeatedly cited Keveanos's complaints of back pain.[6] Moreover, the ALJ specifically noted that Keveanos specifically reported severe back pain after the laminectomy. (*See* R. 28). Accordingly, any error in labeling at Step 2 was harmless given that the ALJ expressly considered the severity of her back pain during Step 3. What Keveanos really objects to is the ALJ's partial discounting of the severity of the back pain in light of the medical evidence, a matter which (absent reversible error under the substantial-evidence standard, of course) is committed to the ALJ's analysis and discretion.

### b. Incomplete analysis of leg-raising tests

The results of straight leg raising tests are implicated in listing § 1.04(A), "if there is involvement of the lower back." Keveanos argues that the ALJ considered only the "straight leg raising tests" that produced negative results, and overlooked others that produced positive results.[7] (PBr. at 19; Reply at 3-4).

The ALJ's opinion refers to the results of Keveanos's straight leg raises twice. First, in addressing treatment records from September of 2016, the ALJ noted a clinical finding that Keveanos had a "negative straight leg raising bilaterally." (R. 28). Second, in evaluating the opinion of Keveanos's treating physician, Dr. Brett Gerstman, the ALJ noted that Dr. Gerstman's records revealed that Keveanos had a negative straight leg raising test. (R. 30).

---

6    *See* R. 20 ("[S]he takes Percocet every two hours but . . . this does not relieve her pain."); R. 28 ("[S]he experiences pain even when cutting an onion," and she lies down "to relieve the pain."); R. 28 ("Treatment records indicate ongoing pain."); R. 28 ("However, the claimant initially responded well to an August 21, 2013 surgical implantation of a spinal cord neuro-stimulator, noting a 75% improvement in pain, and resulting in the claimant reporting a reduction of pain to a moderate level with interferes 'only with some daily activities.'"); R. 28 (noting claimants "continued complaints of moderate-to-severe low back pain radiating to the right leg."); R. 28 ("More recent treatment records from September 2016 corroborate significant, ongoing lumbar pain that is relieved by constantly changing position. Records further indicate that the pain is aggravated by humidity and heat."); R. 28 ("She testified to five surgeries to alleviate pain . . . . However, she indicates no postsurgical pain relief."); R. 30 (claimant was admitted to emergency room for low back pain).

7    "Positive," obviously, in the medical sense that the test result contained something it was testing for.

To be sure, the record contains references to positive straight leg raising tests that were not cited in the ALJ's opinion. These indicated weakness on the right side. (*See* R. 347 (May 28, 2013 "Straight Leg Raising Test positive (weak in right L5)"); R. 341 (April 19, 2016, positive on the right leg, negative on the left leg); R. 337 (May 18, 2016, positive on the right leg, negative on the left)).

However, there is no reason to conclude that the ALJ overlooked the import of these results. *Pintal v. Comm'r of Soc. Sec.*, 602 F. App'x 84, 88 (3d Cir. 2015) ("an ALJ is not required to cite every piece of evidence in the record."). "The straight leg raise test is a physical examination technique used to determine whether nerve root irritation is a possible cause of a patient's pain." *Carlantone v. Colvin*, 2015 U.S. Dist. LEXIS 171930, at *7 n.7 (S.D.N.Y. Dec. 17, 2015). Other evidence of nerve root compression includes limitation in the motion of the spine, motor loss, or muscle weakness. *Wiberg v. Colvin*, 2014 U.S. Dist. LEXIS 116891, at *59 (D. Del. Aug. 22, 2014).

Despite not explicitly noting the existence of positive leg raise tests, the ALJ nonetheless noted other evidence of nerve root compression. Specifically, the ALJ referenced that Keveanos had "limited lumbar flexion" (R. 28); a diminished lumbar range of motion (R. 28); and a reduced range of motion of the lumbar spine flexion to 75%, extension to 50%, and oblique to 50%. (R. 30).[8]

In sum, there is no reason to conclude that the ALJ overlooked the significance of the positive leg raise tests. The law does not require an ALJ to cite every piece of evidence in an opinion; if that were the case, each ALJ opinion would have to reproduce the medical record itself, a requirement both impractical and futile. *See Pintal*, 602 F. App'x at 88; *Jones*, 364 F.3d at 504. More is required to require reversal under the substantial-evidence standard.

---

[8]    "Normal ranges of motion for the lumbar spine are as follows: 60 degrees of flexion, 25 degrees of extension, 25 degrees of left and right lateral flexion, and 30 degrees of left and right rotation." *Carlantone*, 2015 U.S. Dist. LEXIS 171930, at *12 n.9 (internal quotation and citation omitted).

*See Christ the King Manor, Inc. v. Sec'y U.S. Dep't of Health & Human Servs.*, 730 F.3d 291, 305 (3d Cir. 2013) (recognizing that Court may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned"); *Phillips v. Barnhart*, 91 Fed. App'x 775, 780 (3d Cir. 2004) ("the ALJ's mere failure to cite specific evidence does not establish that the ALJ failed to consider it.").

In short, there are no indications that the ALJ failed to consider this evidence or, more important, that the ALJ missed the significance of it. Keveanos does not argue that the ALJ improperly determined that she did not meet the listing criteria for motor loss, accompanied by sensory or reflex loss. *See Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S. Ct. 885, 107 L. Ed. 2d 967 (1990) (to match a Listing impairment, a claimant must satisfy all of the specified medical criteria).

Accordingly, any failure to consider the positive leg tests was harmless.

## 2. Consideration of Treatment Notes

Next, Keveanos argues that the ALJ failed to address the hospital records from Newark Beth Israel and the treatment records from the Neurological Institute of New Jersey. (PBr. at 21 (citing Exhibits 8F and 9F)). Keveanos contends that the ALJ did not consider the opinion of Dr. Mammis, who performed the laminectomy, implanted a spinal cord stimulator, and diagnosed post-laminectomy syndrome. (PBr. at 22). Dr. Mammis recorded that Keveanos had temporary improvement following a stimulator implant, but that the implant subsequently failed and resulted in pain. (*Id.*). Keveanos further argues that the ALJ ignored that her pain increases when she stands, but decreases when she lies down. (*Id.*).

These contentions are without merit. While the ALJ's decision does not cite Dr. Mammis by name or pinpoint-cite these exhibits, it explicitly considers these specific issues. *See* R. 28 ("The record indicates that the claimant had a neural stimulator inserted surgically to alleviate the pain."); R. 28 ("She indicated her average day includes . . . lying down to relieve the pain"); R. 28

("Treatment records from June 2014 indicate that the neuro-stimulator implant's efficacy diminished to the point where she was admitted to the hospital with continued complaints of moderate-to-severe low back pain radiating to the right leg."); R. 28 ("As a result, the claimant underwent a decompressive laminectomy with placement of a new spinal cord stimulator on June 16, 2014.").

These specific findings by the ALJ demonstrate that he necessarily considered Dr. Mammis's records.

### 3. Weight Given to Treating Physicians

The ALJ gave only partial weight to Keveanos's treating physicians, Dr. Thomas Stack and Dr. Brett Gerstman. (R. 30). Keveanos contends that this was in error, and that the treating physicians' opinions should have been adopted in full.

When an ALJ totally rejects a medical opinion, he or she is required to point to "contradictory medical evidence." *Cunningham v. Comm'r of Soc. Sec.*, 507 Fed. App'x 111, 118 (3d Cir. 2012). Where, as here, the ALJ is discounting, rather than rejecting, opinion evidence, he or she must "consider all the evidence and *give some reason* for discounting the evidence." *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999) (emphasis added).

In determining the amount of weight to accord a treating source opinion, it is also well-settled that an ALJ may discount such an opinion when it conflicts with other objective tests or examination results. *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 202-03 (3d Cir. 2008). Likewise, an ALJ may conclude that less weight is appropriate on the basis of discrepancies between the treating doctor's medical opinion and his or her actual treatment notes. *Torres v. Barnhart*, 139 F. App'x 411, 415 (3d Cir. 2005).

With respect to Dr. Stack, Keveanos's treating general practitioner, the ALJ concluded the following:

> Partial weight shall be afforded to the July 10, 2014 general medical report by the claimant's treating physician, Thomas Stack, M.D. While he persuasively opines that the claimant can sit for less

than six hours he does not specify how much less. While Dr. Stack does adequately summarize the claimant's medical history and physical findings, he nevertheless presents little in the way of substantiating the specific limitations he alleges. Specifically, his findings for standing or walking for less than one hour a day, and for sitting for less than six hours a day are neither supported by his own report nor by the balance of the medical evidence. Moreover, his report of other limitations is unclear or inconsistent, for example by checking multiple, contradictory boxes in his report (Exhibit 5F).

(R. 30).

First, Keveanos argues that the ALJ reached an inconsistent conclusion regarding her ability to sit. (PBr. at 25). There is a clash, says Keveanos, between the ALJ's determination (1) that Dr. Stack "persuasively opine[d] that the claimant can sit for less than six hours he does not specify how much less," and (2) that Dr. Stack's finding "for sitting for less than six hours a day [was] neither supported by his own report nor by the balance of the medical evidence." (*Id.*). While this language is admittedly not crystal clear, the ALJ's determination is clarified in his RFC finding — Keveanos could sit for six hours, but had to stand for ten minutes after every twenty minutes of sitting. (R. 29).

Next, Keveanos challenges the ALJ's determination that Dr. Stack's "report of other limitations is unclear or inconsistent, for example by checking multiple, contradictory boxes in his report." (PBr. at 26 (citing (R. 308)). Dr. Stack filled out a report that evaluated Keveanos's ability to perform certain work activities and indicated whether Keveanos was either "Limited" or had "No Limitation." (R. 308). Dr. Stack evaluated her ability to lift, carry, stand, walk, and push/pull. (*Id.*). Dr. Stack selected both "No Limitation" and "Limited" under "Other," which accessed Keveanos's ability to handle objects, hear, speak, and travel. (*Id.*). Dr. Stack also circled "hearing, speaking, and traveling," and drew a line towards "Limited." (*Id.*). The questionnaire provided space for Dr. Stack "describe below" his determination of "Limited," but he provided no further explanation. (*Id.*)

The ALJ was not required to surmise what Dr. Stack's conclusion was. Dr. Stack selected both "Limited" and "No Limitation," and did not explain. That is a fact upon which the ALJ could legitimately rely.

Finally, Keveanos challenges the ALJ's determination that Dr. Stack's report was "neither supported by his own report nor by the balance of the medical evidence." (PBr. at 26-27). In particular, Keveanos alleges that the record supports a finding that she has post laminectomy syndrome. (PBr. at 27).

The ALJ's determination that Dr. Stack's assessment was conclusory, and therefore entitled to less weight, is evident from his analysis of Stack's report. *See Kurilla v. Barnhart*, 2005 WL 2704886, at *5 (E.D. Pa. Oct. 18, 2005) (ALJ may properly reject opinion "'on the basis of contradictory medical evidence,' or if the opinion is unsupported by medical data." (citation omitted)). Dr. Stack's report merely lists Keveanos's diagnosis (chronic L5S1, radiculitis, and hypothyroidism), and checks off boxes without providing sufficiently specific details as to the basis for his conclusion, and what evaluative steps he took. Notably, Dr. Stack did not diagnosis Keveanos with post laminectomy syndrome. The ALJ may discount the opinion of a treating physician if it is not well-supported by objective evidence or is "inconsistent with the other substantial evidence" in the record. 20 CFR 404.1527(c)(2); *Johnson*, 529 F.3d at 202.[9]

---

[9]      Keveanos, in passing, contends that the ALJ erred by failing to obtain Dr. Stack's complete medical records. (PBr. at 23-24). Instead, the ALJ relied upon a medical report that Dr. Stack had completed on July 29, 2014. (R. 309). Notably, during the hearing, Keveanos, who was represented by counsel, was asked whether there were any more documents that would be presented. (R. 39). Counsel answered in the negative. *Id.*

It is the claimant's burden to prove that he or she is disabled. 20 C.F.R. § 404.1512 (a)(1). This requires that the claimant submit or inform the Social Security Administration ("SSA") of "all evidence known to" the claimant "that relates to whether or not [the claimant is] blind or disabled." *Id.*

I do not ignore the duty of an ALJ, particularly where a claimant is unrepresented, to develop the record. *See* 20 C.F.R. § 404.1512(b)(1) ("Before we make a determination that you are not disabled, we will develop your complete medical

Keveanos also challenges the ALJ's decision to give only partial weight to the opinion of Dr. Gerstman. With respect to that treating physician, the ALJ concluded as follows:

> Likewise, partial weight shall afforded to the October 24, 2016 medical source statement by treating physician Brett Gerstman, M.D. His conclusory opinions that the claimant is limited to sitting for less than two hours, standing or walking for one hour, and performing manipulative functions either rarely or occasionally are not supported either by the medical record or by his own treatment records. In his treatment records, Dr. Gerstman notes muscle weakness and tenderness in the lumbar paraspinal muscles and gluteus, and reduced range of motion of the lumbar spine flexion to 75%, extension to 50%, and oblique to 50%. A SPECT scan revealed findings consistent with underlying facet joint dysfunction. However, straight leg raising was negative bilaterally, head and neck findings were normal, muscle strength was 5/5 bilaterally in the claimant's hip flexion and abduction, and neurological findings were also normal. In addition, a May 8, 2016 lumbar CT scan revealed mild diffuse degenerative changes

history for at least the 12 months preceding the month in which you file your application."); see Sims v. Apfel, 530 U.S. 103, 111, 120 S. Ct. 2080, 147 L. Ed. 2d 80 (2000) (ALJ has a "duty to investigate the facts and develop the arguments both for and against granting benefits."). In order to discharge the duty, the ALJ should "make every reasonable effort to help [the claimant] get medical evidence from [his or her] own medical sources and entities that maintain [his or her] medical sources' evidence when [the claimant gives the SSA] permission to request the reports." 20 C.F.R. § 404.1512(b)(1). But if there are no "obvious gaps" in the administrative record, the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim. Johnson v. Colvin, 2013 WL 4517857, at *12 (D.N.J. Aug. 23, 2013) (citing Rosa v. Callahan, 168 F.3d 72, 79 n.5 (2d Cir. 1999)).

When invited by the ALJ to proffer more medical documentation, Keveanos declined to do so. When an applicant for social security benefits is represented by counsel, the ALJ "is entitled to assume that he is making his strongest case for benefits." Batts v. Barnhart, 2002 WL 32345745, at *8 (E.D. Pa. Mar. 29, 2002) (citing Glenn v. Sec. of Health and Human Serv., 814 F.2d 387, 391 (7th Cir. 1987)); but see Trancynger v. Comm'r of Soc. Sec., 269 F. Supp. 3d 106, 118 (S.D.N.Y. 2017) ("An ALJ has a duty to develop the record regardless of whether the claimant is represented by counsel."). Here, the ALJ did not act unreasonably in relying on the statement of Keveanos's counsel that no documentation was missing from the record.

Moreover, Keveanos does not point to any "obvious" gaps in the record (particularly the most pertinent records for the 12 months preceding the application) that the ALJ should nevertheless have perceived. The thrust of her presentation is that the record "overwhelmingly" supported a finding that Keveanos suffers from post laminectomy syndrome—a condition which, by the way, Dr. Stack did not diagnose.

without focal abnormality or any nerve root involvement. Consequently, the restrictive limitations in Dr. Gerstman's opinion do not comport with his September 2016 examination findings, and his diagnosis for lumbar facet arthropathy would not result in the extreme limitations found in his medical source statement opinion. It should further be noted that the claimant had a short, six month treatment history with Dr. Gerstman when his report was made. However, his opinion that the claimant must alternate sitting and standing every 20 minutes, and that she must avoid temperature extremes and humidity, is supported by the treatment record (Exhibit 10F; see Exhibit 7F).

(R. 30). Here, Keveanos principally argues that the ALJ's "factual basis was not correct," and reargues that there were positive straight leg tests in the record. (PBr. at 29). Otherwise, Keveanos seems to be suggesting that the ALJ's citation to Dr. Gerstman's notes somehow equated to improper medical opinion by the ALJ.

I do not view the ALJ as having injected his own lay medical opinion. The ALJ, in partially crediting Dr. Gerstman, illustrated the inconsistency between his opinion and his treatment notes, a legitimate consideration for an ALJ who is evaluating medical opinion evidence. *See Dunson*, 615 F. App'x at 69 (holding that ALJ properly discounted treating physician's opinion where statement was inconsistent with doctor's "own treatment notes."). Accordingly, I find no error in the ALJ's evaluation of Dr. Gerstman's opinion.

### 4. Reliance on State Agency Opinion

Keveanos challenges the ALJ's reliance on the state agency opinion of Dr. Raymond Briski, M.D., an internist. (PBr. at 30-35). There is, of course, no facial error in an ALJ's reliance on "highly qualified . . . experts in Social Security disability evaluation." 20 C.F.R. §§ 404.1527(e)(2)(i), 416.927(e)(2)(i); *see also Chandler*, 667 F.3d at 361 ("[S]tate agency opinions merit significant consideration."). Keveanos, however, has more specific criticisms.

First, Keveanos contends that Dr. Briski's opinion impermissibly rests on a single medical report from May 15, 2014. (PBr. at 32). While this particular note was cited, Dr. Briski did also review the other medical evidence in the record. (R. 58). Keveanos also claims that Dr. Briski did not consider Dr.

Mammis's records, Keveanos's laminectomy, or the surgical implant. (PBr. at 32). However, Dr. Briski's report specifically states that "prior to her recent spinal cord implantation, she had no documented lower extremity motor deficits." (R. 60). This argument, then, is insufficient to surmount this court's deferential substantial-evidence standard of review.

As recognized above, it is not the job of this Court to "re-weigh the medical opinions of record." *Hatton*, 131 F. App'x at 880. This Court's focus is on whether the ALJ's weighing of "such opinions was supported by substantial evidence." *Id.* Based on the evidence in the record and the ALJ's stated reasons, the Court finds that the ALJ's determination of how much weight to give the medical opinions was supported by substantial evidence in the record.

## B. RFC Determination

Keveanos's second broad argument is that the ALJ failed to properly credit her subjective complaints in evaluating her RFC. Relatedly, Keveanos argues that the record supported a finding that Keveanos cannot sit for a total of six hours.

RFC is an assessment of the most a claimant can do despite his or her impairments. 20 C.F.R. § 404.1545. To determine a claimant's RFC, an ALJ must engage in a two-step process: First, consider all of a claimant's symptoms that can reasonably be accepted as consistent with the objective medical evidence; and second, determine how those symptoms affect the claimant's ability to work. 20 C.F.R. § 404.1529.

In evaluating a claimant's symptoms for RFC purposes, the ALJ must "consider all [of the claimant's] symptoms, including pain, and the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. § 416.929(a). Subjective complaints, then, must be given due consideration, but will be evaluated in the context of objective evidence:

> [A claimant's subjective complaints of] pain or other symptoms will not alone establish that [the claimant is] disabled; there must be medical signs and laboratory findings which show that [the claimant has] a medical impairment(s) which could reasonably be

expected to produce the pain or other symptoms alleged and which, when considered with all of the evidence (including statements about the intensity and persistence of [the claimant's] pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that [the claimant] is disabled. In evaluating the intensity and persistence of [the claimant's] symptoms, including pain, [the ALJ must] consider all of the available evidence, including [the claimant's] medical history, the medical signs and laboratory findings and statements about how [the claimant's] symptoms affect [him or her].

*Id.* (alteration added); *see Hartranft v. Apfel*, 181 F.3d 358, 362 (3d Cir. 1999) (rejecting claimant's argument that ALJ failed to consider subjective symptoms when ALJ found that subjective symptoms were inconsistent with objective medical evidence and claimant's hearing testimony).

Once an underlying physical impairment has been shown, the ALJ must next evaluate the intensity and persistence of the claimant's symptoms to determine how they limit a claimant's capacity for work. 20 C.F.R. § 404.1529(c)(1). In evaluating the intensity and persistence of those symptoms, an ALJ should consider all of the available evidence, including the claimant's medical history, the medical signs and laboratory findings, statements from the claimant, and his or her treating or non-treating source, or statements from other persons. *Id.*

When a claimant's alleged symptoms suggest a greater level of impairment than can be supported by the objective medical evidence alone, an ALJ should consider the following factors to assess the credibility of a claimant's statements: (i) the extent of the claimant's daily activities; (ii) the location, duration, frequency, and intensity of the symptoms; (iii) precipitating and aggravating factors; (iv) the type, dosage, effectiveness, and side effects of any medication; (v) treatment other than medication for the symptoms; (vi) measures used to relieve pain or other symptoms; and (vii) other factors concerning functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3).

It is true that the ALJ must consider all relevant evidence, including subjective complaints, in determining the RFC. *Fargnoli v. Massanari*, 247 F.3d 34, 41 (3d Cir. 2001) (citing 20 C.F.R. § 404.1545(a)). However, the claimant retains the burden of supporting his or her alleged RFC limitations. *Bowen v. Yuckert*, 482 U.S. 137, 146 (1987); *see also* 20 C.F.R. § 404.1545(a) ("In general, you [the plaintiff] are responsible for providing the evidence we will use to make a finding about your residual functional capacity."). An ALJ may reject, or only partially credit, subjective complaints if they are not credible in light of the other evidence of record. *Schaudeck v. Comm'r of Soc. Sec.*, 181 F.3d 429, 433 (3d Cir. 1999). The ALJ's credibility determination, however, "must contain specific reasons for the finding of credibility, supported by the evidence in the case record." *See* 20 C.F.R. §§ 404.1529(b), 416.929(b).

Keveanos asserts that the ALJ did not point to competent medical evidence in discounting Keveanos's complaints of pain. (PBr. at 35-36). That assertion does not square with the record. The ALJ correctly engaged in the two-step process in evaluating Keveanos's subjective complaints. (R. 28-30).

The ALJ explicitly considered Keveanos's testimony and subjective complaints. Far from ignoring them, he took them into account in limiting her to the lowest, sedentary exertional level. (*See* R. 28-29). The ALJ explicitly credited Keveanos's subjective complaints that were consistent with the record evidence. (*See* R. 29 (crediting Keveanos's complaints that humidity and wetness aggravated her symptoms and limited RFC to occasional exposure to humidity and wetness); R. 28 (crediting Keveanos's complaints that she could sit for only 20 minutes and limiting RFC to 20 minutes of sitting at a time, followed by 10 minutes of standing)).

However, the ALJ determined that neither the treatment records nor the diagnostic evidence supported the level of limitations alleged. (R. 28). Treatment records from 2013 revealed "normal neurologic and motor examination findings, intact sensory examination findings, unremarkable deep tendon and pathologic reflexes, and a normal examination of the spine with no

muscle spasm upon palpation." (R. 28). After receiving the spinal implant, Keveanos reported "a reduction of pain to a moderate level which interferes only with some daily activities." (*Id.*). More recent records from 2016 revealed "ongoing lumbar pain that is relieved by constantly changing position," but "normal reflexes, a normal gait, negative straight leg raising bilaterally, full range of motion bilaterally of hips, and normal motor findings." (R. 28). Based on all of the medical evidence, the ALJ properly discounted—to some degree—Keveanos's subjective complaints.

Finally, Keveanos contends that the ALJ should have adopted Dr. Stack's opinion that she can sit for less than six hours. (PBr. at 36-37). The RFC is not entirely inconsistent with Dr. Stack's opinion, however (particularly as partially discounted, *see supra*). The RFC limited Keveanos to six hours of sitting, provided that she could stand for 10 minutes for every 20 minutes of sitting. (R. 29).

In sum, the ALJ's RFC finding, which limited Keveanos to sedentary work with a number of restrictions, is supported by substantial evidence in the record.

### III.   Conclusion

For the foregoing reasons, the ALJ's decision is affirmed. An appropriate order accompanies this Opinion.

Dated: April 5, 2019

**KEVIN MCNULTY**
**United States District Judge**